RECEIVED
AUG 21 2018
TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 6:17-CR-00327-02 |
| VERSUS | * | JUDGE DRELL |
| DAVID WAYNE WILLIAMS<br>a/k/a "Big Dave" | * | MAGISTRATE JUDGE WHITEHURST |

**STIPULATED FACTUAL BASIS FOR GUILTY PLEA**

The United States of America, through the undersigned Trial Attorney for the United States Department of Justice Organized Crime and Gang Section, Assistant United States Attorney, and the defendant, DAVID WAYNE WILLIAMS, a/k/a "Big Dave" represented by his undersigned counsel, for the purposes of providing the Court with the following factual basis for a guilty plea pursuant to Rule 11(b)(3) of the Federal Rules of Criminal Procedure. If this case were to proceed to trial, the United States could prove each element beyond a reasonable doubt. The following facts, among others, would be offered to establish the defendant's guilt:

**The Racketeering Enterprise: The Aryan Circle**

The defendant DAVID WAYNE WILLIAMS, a/k/a "Big Dave," and others, known and unknown, were members of the Aryan Circle (hereinafter the "AC"), a criminal organization whose members and associates engaged in narcotics distribution, firearms trafficking, and acts of violence involving murder, attempted

murder, assault, robbery, witness intimidation, and kidnapping. The AC operated throughout Texas, Missouri, Oklahoma, Indiana, and Louisiana, including the Western District of Louisiana, and elsewhere.

The AC, including its leaders, members, prospects, and associates, constituted an "enterprise," as defined in Title 18, United States Code, Section 1959(b)(2) (hereafter "the enterprise"), that is, a group of individuals associated in fact that engaged in and the activities of which affected interstate and foreign commerce. The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

The AC was a violent, race-based, "whites only" prison-based gang with at least hundreds of members operating inside and outside of state and federal penal institutions throughout Texas, Missouri, Oklahoma, Indiana, and Louisiana. The AC offered protection to white inmates if they joined the gang.

The AC was established in approximately 1985 within the Texas Department of Criminal Justice (TDCJ), where the traditional power centers of the AC and members of the gang's leadership structure resided. Recently, the AC's structure and influence expanded to rural and suburban areas throughout Texas, Louisiana, and Missouri. The AC emerged during a period of internal turmoil within the Aryan Brotherhood of Texas (ABT). Its original membership contained several ex-ABT members as well as others rejected for ABT membership. The AC was relatively small in comparison to other prison-based gangs, but grew in stature and influence within TDCJ in the 1990s, largely through violent conflicts with other gangs, white and non-white alike, including the Mexican Mafia, the ABT, and others.

The AC had a detailed and uniform organizational structure, which is outlined - along with various rules, procedures, and code of conduct - in a written "constitution" widely distributed to members throughout Texas, Louisiana, and elsewhere.

The AC had a defined militaristic structure. AC members referred to the gang as the "Family." The AC had a complex organizational structure which continued to evolve over time. The AC was overseen and directed by a five-member "Upper Board." The Upper Board had ultimate authority in all gang matters. Subordinate ranking members served to support the Upper Board to enforce gang members' discipline and adherence to established AC rules and laws. The Upper Board was comprised of the president, vice president, administrative chairman, and two other members. The AC had six branches: one for Texas prisons; one for the federal prison system; one for out of state prisons; one for international members; one known as a motorcycle biker branch; and one for the "free world," (non-incarcerated gang members) each of which had its own Middle Board. The out of state prisons were further divided into a handful of regions, each incorporating one or more states. The Middle Boards each included the Upper Board members, as well as the vice president and director of each branch. Rules and regulations for the various branches came from Center Rings, which included all Middle Board Members.

The AC was also divided between prison and free world chains of command. Each prison had its own hierarchy. In the free world, Texas was divided into districts, presided over by district captains, who reported to majors who controlled a

number of districts. The AC's ranking structure remained constant; however, personnel changes (promotions, demotions, and terminations) occurred frequently.

The AC also had certain members assigned to the "Task Force," which was comprised of a small group of members handpicked by the Upper Board to enforce the rules of the organization and perform specific tasks or responsibilities. The Task Force was led by a commander and such tasks could range from managing some aspect of the AC's organization to performing a "hit" or other specific criminal act of violence, including meting-out punishment against fellow gang members who violated the gang's rules or killing rival gang members.

AC Upper Board leaders had the authority within the gang to issue "D.O.'s" (direct orders) and mete out punishment. A D.O. was an assignment given to a subordinate AC member that would serve a purpose for the AC. The D.O. could range from a leader ordering a "violation," classified as "minor, serious, or major," an "S.O.S." (smash on sight), meaning the assault of an AC member who had committed a violation of the AC rules which usually resulted in the removal of that member's AC "patch" (gang tattoo) and membership, to a "Green Light" (kill order), meaning the murder of a rival gang member or of an AC member or associate who had committed an egregious violation of the gang's rules. Failure to perform a D.O. resulted in the assigned member being in violation of the rules. Punishment for failing to complete the D.O. could range anywhere from a fine, written violation, beating, or death.

Members of the AC greeted each other and showed their membership in the gang using a handshake intended to represent the motto: "Silence is Golden; Silence

is Deadly; Silence is Mandatory; My Honor is called Loyalty!" The AC employed a robust symbology as well, using depictions of Nazi-style inspired symbols and artwork to demonstrate their affiliation. Members often had tattoos incorporating one or more Nazi-style symbols as well as State-specific symbols including, but not limited to, the Iron Cross, eternal flame, "13" (for first and third letters of the alphabet – "AC"), swastika, and Schutzstaffel ("SS") lightning bolts. The most coveted tattoo of AC membership was the AC patch, which could be worn only by fully made members who generally ascended to full membership by committing a "blood-in mission" (aggravated assault or murder) on behalf of the gang. The design and shape of the patch evolved over time. The diamond tattoo was the basic AC tattoo or "patch." It had many variations, including variations for different states, though common to each tattoo was a swastika tilted to resemble a diamond, "SS" bolts, and the letters "AC" in the center. An older version of the AC patch was a circle with "SS" bolts inside it. AC lexicon included "113%" (100% Aryan Circle), "1388" or Aryan Circle variation of white supremacist code "14/88" (the 88 stood for Heil Hitler), "CFFC" (Circle Forever, Forever Circle), and "DFFD" (Diamond Forever, Forever Diamond), among others. The colors associated with the AC were blue and gray, and members of the AC often demonstrated their affiliation with the AC by wearing clothing containing the colors blue and gray or incorporating some of the gang's other symbols or phrases.

  Once released from incarceration, AC members were required to remain loyal to the AC and were required to immediately report to outside leaders to further the goals of the AC through criminal activity. They were required to attend "church"

meetings, which were meetings held to discuss and conduct AC gang business. One of the goals of the AC was to recruit new members. AC members were recruited from both inside and outside state and federal penal institutions. In order to be considered for AC membership, a person had to be sponsored by another AC member. Once sponsored, a prospective member had to serve a "pre-prospect" term usually of not less than six months, during which he was referred to as a prospect, and his conduct was observed by other gang members. During this period, the prospect was required to study and learn the AC constitution and by-laws. During the prospect period, the individual was considered part of the AC family and entitled to the full protection of the gang. The prospect was also subject to the rules and orders of the gang. If the prospect's conduct during the probationary period was deemed satisfactory, his membership to the gang was submitted to the gang members. The vote had to be unanimous to be admitted to the AC. The prospect could be "black-balled" by a single member of the gang, and refused admission to the AC. All AC members were required to attend monthly "church" meetings where criminal activity was discussed, financial proceeds from criminal activity were collected, including, but not limited to, collection of drug proceeds from subordinate gang members for senior AC gang leaders, and disciplinary beatings of fellow AC gang members were administered. All incarcerated AC members were expected to "put-in-work" for the "family" in order to earn the right to wear the AC patch. This normally required committing an act of violence on behalf of the organization. This rule for AC members in the free world was more loosely applied. Membership in the AC was for life. There was no retirement from the AC.

Unlike most major prison-based gangs, the AC admitted women as full members and had a significant female membership that belonged to the women's branch of the AC. Some women had achieved positions of considerable importance and responsibility within the organization. In addition to members, the enterprise included those closely affiliated with the AC, who were called "associates." Wives or girlfriends of AC members who were not themselves full patched members were often associates and called themselves "featherwoods." They were allowed to associate with the AC so long as they complied with the gang's rules and served to promote the goals of the "family." Associates and featherwoods functioned as communication hubs, facilitating gang communications and criminal activities among imprisoned members throughout the penal system through the use of the telephone, the internet, the United States Mail, and common carriers. Featherwoods and associates also smuggled drugs, cellular telephones, and other items of contraband, to imprisoned gang members.

The purposes of the enterprise included, but were not limited to, the following:

a. Enriching the leaders, members, and associates of the enterprise through, among other things, illegal trafficking of controlled substances and firearms, often in interstate and foreign commerce.

b. Preserving, protecting, and enhancing the power, territory, reputation, and profits of the enterprise through the use of threats, intimidation, violence, and destruction, including, but not limited to, acts involving murder, assault, obstruction of justice, and other acts of violence.

c. Promoting and enhancing the enterprise and its members' and associates' activities.

d. Keeping victims in fear of the enterprise and in fear of its leaders, members, and associates through threats of violence and actual violence.

e. Providing financial support to gang members who were charged with or incarcerated for gang-related activities.

The means and methods by which the leaders, members, and associates conducted and participated in the conduct of the affairs of the AC criminal enterprise included the following:

a. The leaders of the enterprise directed, sanctioned, approved, and permitted other members and associates of the enterprise to carry out acts in furtherance of the enterprise.

b. Members of the enterprise and their associates committed, conspired to commit, and threatened to commit acts of violence, including murder, attempted murder, kidnapping, robbery, assault, intimidation, and extortion to protect the enterprise's power, territory, and property.

c. To generate income, AC members and associates engaged in illegal activities under the protection of the enterprise, including narcotics trafficking, weapons trafficking, and other illegal activities. The narcotics distributed by the enterprise traveled in interstate commerce.

d. For protection, attacks, and armed combat, AC members and associates acquired, carried, and used firearms.

e. Members and associates of the enterprise employed and used gang-related terminology, symbols, phrases, and gestures to demonstrate affiliation with the gang.

f. To perpetuate the enterprise and to maintain and extend their power, members and associates of the enterprise committed and conspired to commit acts including murder, attempted murder, intimidation, and assault against individuals who posed a threat to the enterprise or jeopardized its operations, rival organizations, AC members, and witnesses to illegal activities of the enterprise.

g. Members and associates of the enterprise talked in code when communicating over the telephone and/or in writing to avoid law enforcement detection, and communication in person was always preferable.

h. Members of the enterprise and their associates were forbidden from cooperating with law enforcement. Legal paperwork was reviewed for signs of cooperation.

The above-described enterprise, through its members and associates, engaged in racketeering activity as defined in Sections 1959(b)(1) and 1961(1), of Title 18, United States Code, that is, multiple acts involving murder, robbery, extortion, and kidnapping, in violation of Texas Penal Code, Louisiana Revised Statutes, and Missouri Revised Statutes; and multiple acts involving narcotics trafficking, in violation of Sections 841(a)(1) (distribution and possession with the intent to distribute a controlled substance) and 846 (conspiracy to distribute and possess with the intent to distribute a controlled substance), of Title 21, United States Code.

The defendant admits to the following:

The defendant is a full "patched" member of the Aryan Circle. On or about July 1, 2016, the defendant attended an Aryan Circle "church" meeting in Turkey Creek, Louisiana, hosted by the defendant. At the time of the meeting, the defendant was an Upper Board member of the Aryan Circle. An Upper Board member represents the senior leadership of the AC.

The "church" meeting was held at the residence of Leland Hamm, AC District Captain for Louisiana. Eight AC members were present at the gathering: the defendant; Jeremy "JJ" Jordan; Michael Auxilien; Christina Williams, wife of David Williams; Leland Hamm; Richard Smith; Brian "Sneak" Granger; and Clifton "Tarzan" Hallmark. Several non-AC members were also in attendance.

At the party, Michael Auxilien engaged in a verbal argument with fellow AC member Clifton Hallmark. Hallmark had been ridiculing Auxilien by calling him a prospect. The argument escalated and Hallmark and Auxilien moved outside to the front lawn. Hallmark and Auxilien decided to resolve their dispute with a physical fight, as was AC custom. Leland Hamm, Richard Smith, Brian Granger, Jeremy Jordan, and Christina Williams were all outside of the house and witnessed the fight and subsequent shooting.

When the fight moved outside, Hallmark picked-up a shovel and swung it at Auxilien, causing Auxilien to duck to avoid being struck with the shovel. The defendant took the shovel away from Hallmark and scolded him for attempting to use a weapon against a fellow gang member. Auxilien then tackled Hallmark and held him to the ground. Hallmark stood, began walking towards his van, and reached at

his pocket. Hallmark said something to the effect of "I can just end this with my gun." At that moment, Jeremy Jordan moved towards Hallmark, pulled a pistol from his pocket, and shot Hallmark in the side of the head at point blank range.

Richard Smith and Jeremy Jordan moved Hallmark's body inside of the residence. With the body now lying on the floor of the house, the defendant, Richard Smith, Jeremy Jordan, Christina Williams, Michael Auxilien, Leland Hamm, and Brian Granger discussed their options. A cover-up story was developed in order to conceal the murder from law enforcement. The plan was for Heather Tate and Anissa Hallmark to load Clifton Hallmark's body into his vehicle, drive to a local gas station, and call 911. Tate and Hallmark were instructed to tell law enforcement that they had been robbed, and that the assailants shot Hallmark in the head. Michael Auxilien and Jeremy Jordan assisted in this plan by moving Clifton Hallmark into his van. Tate and Anissa Hallmark then drove away with the victim and called 911 and relayed the bogus story about the murder, as instructed.

Immediately following the shooting, Jeremy Jordan gave the defendant the firearm used to shoot Hallmark. The defendant took possession of the firearm from Jordan and disposed of it in order to conceal the firearm from law enforcement.

On March 20, 2018, the defendant was arrested at his home in Sulphur, Louisiana. During a search of the defendant's home, law enforcement discovered a Kel-Tec 9mm pistol and a distribution amount of methamphetamine. The gun and the drugs were located in Williams' bedroom on his side of the bed. Particularly, the gun was located on the ground between the bed and the defendant's nightstand. The methamphetamine was found in the defendant's nightstand along with baggies, an

electronic scale, multiple cell phones, and other drug paraphernalia. The methamphetamine was later tested by the Drug Enforcement Administration and determined to be 14.2 grams of actual methamphetamine.

The parties stipulate that the defendant's possession of the firearm affected interstate commerce, that, prior to the defendant's possession of Kel-Tec 9mm pistol, he had been convicted in a court of a crime punishable by imprisonment for a term in excess of one year, and that the offenses occurred within the Western District of Louisiana.

7/31/18
Date

DAVID WAYNE WILLIAMS, aka "Big Dave"
Defendant

31 July 2018
Date

FRANK GRANGER, LA Bar No 06219
Attorney at Law
1135 Lakeshore Drive, 6th Floor
Lake Charles, Louisiana 70601
Telephone: (337) 439-1655

                              DAVID C. JOSEPH
                              United States Attorney

8-21-18                   [signature]
Date

                              DOMINIC ROSSETTI, CA Bar ID 287676
                              Assistant United States Attorney
                              800 Lafayette Street, Suite 2200
                              Lafayette, Louisiana 70501
                              Telephone: (337) 262-6618


                              DAVID L. JAFFE
                              Acting Chief, Organized Crime and Gang Section
                              United States Department of Justice

8-21-18                   [signature]
Date

                              DAVID N. KARPEL, CO Bar ID 17865
                              Trial Attorney, Organized Crime and Gang Section
                              1301 New York Ave, NW, Suite 700
                              Washington, DC 20005
                              Telephone: (202) 307-5715